**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 2 7 2011 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------X

CRAIG SAMUELS,

        Petitioner,

 - against -

HAROLD GRAHAM, superintendent,
Auburn Correctional Facility,[1]

        Respondent.

-----------------------------------------------------X

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**

Civil Action No.
CV-05-3960 (CBA)

AMON, Chief Judge:

    Craig Samuels ("Samuels") is a New York State prisoner serving a twenty-year sentence

for first-degree rape and concurrent sentences of ten to twenty years for unrelated offenses.

Samuels now brings this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

For the reasons that follow, his petition is denied.


**Background**

**A. Prosecution Testimony**

    After a one-week trial in February 2001 in the Supreme Court, County of Kings, a jury

found Samuels guilty of raping Victoria Santiago and not guilty of two other sexual assaults: the

alleged rape of Tonya Jones (and related lesser counts) and the alleged robbery and attempted

sodomy of Ibian Soto. At trial, the prosecution presented the following evidence pertaining to

the rape of Santiago, an eighteen-year-old prostitute.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Clerk of this Court is
directed to update the case caption by substituting Samuels's current custodian, Harold Graham,
for his previous one, Thomas Poole.

Santiago testified at trial to the following facts. On August 12, 1999, early in the morning, she was sitting on a bench on West 25th Street and Surf Avenue in Coney Island. Trial Tr. 184-86, 224-25.[2] Samuels was sitting in a parked car across the street from Santiago and motioned for her to come over. Id. at 196-87. Believing Samuels to be a potential customer, she accepted his invitation, walked over to his car, and entered into the passenger's seat. Id. at 188-90. After discussing her services, Santiago agreed to undress for ten dollars while Samuels masturbated. Id. at 191. Samuels drove to a nearby parking lot. Id. at 190-92. They both then moved to the back seat. Id. at 192-93. Santiago began to undress while Samuels took out his wallet. Id. at 193-94. When Samuels stated that he had only a twenty-dollar bill, Santiago proposed to make change after the transaction was completed and to hold onto the twenty dollars in the meantime. Id. at 193. Samuels declined to pay up front, stating that he would pay the ten dollars after changing the twenty-dollar bill. Id. at 194. Without receiving payment in advance, Santiago refused to perform. Id. at 194.

Samuels then forced himself on Santiago, and a physical struggle ensued. Id. at 194-95. Samuels struck Santiago on the lip and put his hand on her throat. Id. at 195. Santiago tried to open the back door of the car, but the door was locked and she was unable to unlock it. Id. at 196. Samuels threatened Santiago that he would cut her with a knife while he sodomized her. Id. at 196. Apparently this threat subdued Santiago because she soon stopped struggling. Id. at 196-97.

Samuels then raped Santiago. Id. at 198. Santiago testified that she was shaking and

---

[2] The trial transcript is contained in Exhibits A and B of the State Court Record. All subsequent citations to the State Court Record are in the form "R. Ex. __."

crying while Samuels raped her. Id. Santiago pleaded with Samuels to tell her why he was doing this to her, to which Samuels responded, "I know you wouldn't understand this, but I'm doing this because you're so beautiful." Id. at 199. After about ten minutes, Samuels ejaculated. Id. at 198-99.

Samuels then climbed into the driver's seat and drove out of the parking lot while Santiago dressed. Id. at 199. Samuels stopped the car, unlocked the doors using the power door lock button and ordered Santiago out of the car. Id. at 199-200. Santiago memorized Samuels's license plate number as he drove away and then wrote it down on a piece of paper. Id.

Immediately after the incident, Santiago located a pay phone and called 911, reporting that she had been raped. Id. at 201-02, 210, 239. Soon after, two officers from the New York City Police Department arrived. Id. at 202. Santiago told the officers that she had been raped. Id. at 203-04. An ambulance arrived and took Santiago to Coney Island Hospital. Id. at 205. At the emergency room, a detective interviewed Santiago and obtained Samuels's license plate number from her. Id. at 253-54. Before Santiago left the emergency room, the hospital placed her in a detoxification program. Id. at 207. On September 9, 1999, nearly a month after the rape, the police arrested Samuels, and Santiago identified him in a lineup conducted that same day. Id. at 208.

Santiago had been in detoxification before, thirteen times by her count. Id. at 216. She stated that she never had to pay for the treatment because Medicaid had covered it. Id. at 217.

One of the police officers who responded to the 911 call also testified at trial. He said he found Santiago sitting on a bench, crying and hugging her knees to her chest. Id. at 274-75. It took several minutes for Santiago to calm down enough to tell the officer that she had been

raped. Id. at 275-76, 276-78.

Dr. Jacques Moritz, a medical expert in obstetrics and gynecology who did not examine Santiago, testified about facts contained in Santiago's medical records and about his opinions relating to his experience examining rape victims. Dr. Moritz testified that rape victims often do not sustain vaginal injuries even when intercourse is forced and that it is "very unusual to find signs of injury on visual examination." Id. at 303-05. Dr. Moritz also testified that Santiago's hospital records indicated that Santiago had an ecchymosis (a bruise) on her neck. Id. at 308-09, 311. On cross-examination, defense counsel asked Dr. Moritz to refer him to the pages of the records that contained reports of the bruise, and Dr. Moritz handed the relevant pages to defense counsel. Id. at 311-12. Counsel then asked Dr. Moritz whether the EMS report indicated any injuries to Santiago's neck. Dr. Moritz answered that, based on the record, the EMT who examined Santiago just after she called 911 noted no injuries to Santiago's neck. Id. at 312-13. On redirect, Dr. Moritz testified that, though it is hard to opine, black-and-blue bruising usually does not appear until about six hours after force was applied to that area. Id. at 320. Dr. Moritz also testified on direct that the day after Santiago was admitted into detoxification, she refused methadone. Id. at 309.

**B. Defense Testimony**

Samuels testified at trial in his own defense. According to Samuels, on the morning of August 12, 1999, Santiago approached his car and propositioned him. Trial Tr. 404-05. After discussing her services, Santiago agreed to engage in sexual intercourse with Samuels for ten dollars. Id. at 406. Santiago agreed to accept payment after the encounter because Samuels had only a twenty-dollar bill on hand. Id. at 410-11, 433, 441-42. Samuels testified that he had

-4-

consensual sex with Santiago in his car.[3] Id. at 411. During intercourse, Samuels noticed sores on Santiago's body, and he became angry because he feared that she may have AIDS or another sexually transmitted disease. Id. at 411-13. Samuels abruptly ended the encounter and let Santiago out of his car without paying her. Id. at 414-15.

The prosecution also presented evidence regarding the alleged sexual assaults of Jones and Soto, but in light of the acquittal those alleged acts are not at issue here.

## C. Conviction and Sentencing

The jury found Samuels guilty of one count of Rape in the First Degree, N.Y. Penal Law § 130.35(1), for sexually assaulting Santiago and not guilty of the remaining charges. Id. at 603-08. On March 8, 2001, the trial court sentenced Samuels to twenty years incarceration. R. Ex. C, at 3, 13. Before adjourning, the court addressed the remaining indictment that charged Samuels with sexually assaulting two additional women.[4] Id. at 13-19. The court presented to Samuels the option of pleading guilty to the remaining indictment with the understanding that he could withdraw his plea if his trial conviction were reversed on appeal. Id. at 13-14. In return, the court promised to run the sentence of ten to twenty years concurrently with Samuels's twenty-year sentence for raping Santiago. Id. at 13, 16. Samuels pled guilty to the remaining

---

[3] Defense counsel and the prosecution stipulated that it was unlikely that, based on forensic analysis done by the New York City Medical Examiner's Office, the semen from the vaginal swab conducted at the hospital came from someone other than Samuels. Id. at 395-97.

[4] In an indictment filed in 2000, a King County grand jury charged Samuels with one count of Burglary in the First Degree, N.Y. Penal Law § 140.30(3), one count of Rape in the First Degree, N.Y. Penal Law § 130.35(1), two counts of Sodomy in the First Degree, N.Y. Penal Law § 130.50(1), and other lesser counts for his alleged acts against Alice Green; and two counts of Rape in the First Degree, one count of Sodomy in the First Degree and other lesser counts for his alleged acts against Paula Blocken. See id. at 23-24.

indictment, and the court sentenced Samuels accordingly. Id. at 18-19, 24.

## D. Direct Appeal

Samuels appealed his convictions to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department ("Appellate Division"), raising the following issues: (1) the verdict was against the weight of the evidence and his guilt was not proven beyond a reasonable doubt, (2) the trial court erred by failing to give an adverse-inference charge as to the prosecutor's loss of a handwritten aided report, (3) the prosecutor's summation remarks denied him a fair trial, and (4) if the Appellate Division reversed his conviction at trial, it should reverse his conviction on his plea of guilty. R. Ex. D, at 19-32.

The Appellate Division affirmed the trial court. First, it held that the sufficiency of the evidence and adverse-inference charge issues were unpreserved at the trial court level and thus procedurally barred from appellate review. People v. Samuels, 303 A.D.2d 769, 770, 757 N.Y.S.2d 104, 105 (2d Dep't 2003). Nonetheless, in an alternative holding, the court found those two claims to be meritless. The court concluded that the evidence, when viewed in the light most favorable to the prosecution, "was legally sufficient to establish the necessary elements of rape in the first degree beyond a reasonable doubt," and that "the failure to produce [the handwritten aided] report did not prejudice the defendant." Id. It then summarily denied the remaining claims, i.e., those pertaining to prosecutorial misconduct and the guilty plea, on the merits. Id. ("The defendant's remaining contentions are without merit.").

Samuels applied for leave to appeal to the New York Court of Appeals ("Court of Appeals"). R. Ex. F. In her letter to the Court of Appeals judge evaluating the application, appellate counsel, who did not represent Samuels at trial, focused solely on Samuels's

-6-

prosecutorial misconduct issue. R. Ex. G. On July 9, 2003, the Court of Appeals summarily denied his leave application. People v. Samuels, 100 N.Y.2d 586, 796 N.E.2d 489, 764 N.Y.S.2d 397 (2003) (Ciparick, J.) (table opinion).

## E. Post-Appeal State Court Proceedings

In September 2003, Samuels's mother hired a private investigator to locate the physician assistant and the nurse who treated Santiago at the hospital. The physician assistant, Donna Coules, stated in an affidavit that she had recently reviewed Santiago's hospital chart, and that the chart disclosed that she had found abrasions to the anterior portion of Santiago's neck and that Santiago stated that she was a heroin abuser and would like detox. R. Ex. J ("Section 440.10 Motion") Ex. A ("Coules Aff.") at 1-2. The nurse, Oma Dinally, stated in an affidavit that a review of her assessment disclosed that Santiago showed no signs of distress and stated that she was raped and was a heroin user. Section 440.10 Motion Ex. B ("Dinally Aff.") at 1.

On May 30, 2004, Samuels moved the trial court to vacate his convictions pursuant to Section 440.10 of the New York Criminal Procedure Law. In his motion, Samuels argued that (1) the prosecutor procured the jury's verdict by duress, misrepresentation or fraud; (2) the prosecutor advanced false material evidence at trial; (3) new evidence had emerged since trial that undermined the testimony of Dr. Moritz; (4) trial counsel was ineffective; and (5) he was provided with incompetent representation because of New York's inadequate compensation for court-appointed defense counsel. In his reply brief, Samuels raised a claim based on Crawford v. Washington, 541 U.S. 36 (2004), for the first time. R. Ex. L, at 13-14.

A single argument underpinned all the claims Samuels brought in the Section 440.10 Motion and most of the claims in the instant petition; namely, the assertion that Dr. Moritz's trial

testimony on the issue of the marks on Santiago's neck was false and prejudicial. As noted, Dr. Moritz testified that, based on the medical records, Santiago had a bruise on her neck, evidencing that she was choked. This was false, according to Samuels, because Coules had characterized the mark on Santiago's neck as an abrasion, and prejudicial because it provided the basis for the first-degree rape element of "forcible compulsion."[5] See R. Ex. J, Mem. of Law 8-9.

The trial court denied the motion, holding, pursuant to section 440.10(2)(c) of the Criminal Procedure Law, that all of the claims except ineffective assistance of counsel and the Crawford claim could and should have been raised on direct appeal and were thus procedurally barred. R. Ex. O, at 1, 3. However, the court stated that it had reviewed the Coules and Dinally affidavits and, without accepting that they were newly discovered evidence, concluded that "[n]othing in [them] supports [Samuels's] contention that the medical evidence offered at trial was inaccurate or fraudulent." Id. at 3.

The court reviewed the ineffective assistance of counsel and Crawford claims on the merits. It found that trial counsel was not ineffective in any respect, noting that counsel "vigorously cross-examined the key prosecution witnesses, gave an excellent summation, . . . ultimately secured acquittals on all counts relating to two of the three complainants," and "used an EMS report to try and impeach [Dr. Moritz,] who testified about the neck bruise to Ms. Santiago." Id. at 2-3. The court also noted that Crawford has not been applied retroactively to

---

[5] Samuels also faulted Dr. Moritz for undercutting Samuels's trial defense, which was, in part, that Santiago fabricated the rape charge to gain admission into the hospital for detoxification. To wit, Samuels highlighted Dr. Moritz's testimony that the medical records reflected that Santiago had refused methadone the day after she was admitted into detoxification. Although Samuels does not challenge the truthfulness of Dr. Moritz's testimony, he appears to take issue with the implication that, by refusing methadone, Santiago was not interested in detoxification.

collateral attacks on a conviction. Id. at 1 n.1.

Samuels appealed, and the Appellate Division summarily denied Samuels's application for leave to appeal, R. Ex. S.

On January 8, 2005, Samuels applied to the Appellate Division for a writ of error coram nobis arguing that appellate counsel was ineffective. R. Ex. T ("Coram Nobis Motion"). Samuels faulted appellate counsel for (1) failing to argue that Dr. Moritz's testimony as to the contents of the medical records was hearsay and violated the Confrontation Clause, (2) not expanding the record on appeal or conducting her own investigation, (3) not arguing the ineffectiveness of trial counsel, (4) not requesting reargument of the direct appeal, and (5) failing to properly indicate that the adverse-inference charge issue was preserved for direct appeal. R. Ex. T. The Appellate Division denied his application, People v. Samuels, 18 A.D.3d 481, 793 N.Y.S.2d 769 (2d Dep't 2005), and on June 28, 2005, the Court of Appeals denied leave to appeal, People v. Samuels, 5 N.Y.3d 769, 834 N.E.2d 1273, 801 N.Y.S.2d 263 (2005) (Smith, J.) (table opinion).

## F. Instant Petition

On August 5, 2005, Samuels filed the instant petition for a writ of habeas corpus raising nine related claims, and on January 28, 2011, this case was reassigned to this Court. Five of the claims were properly exhausted and were denied on the merits by the state courts. They include (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; (3) prosecutorial misconduct during summation; (4) newly discovered evidence; and (5) the introduction of evidence at trial in violation of Crawford. In each instance, the state courts' conclusions were neither contrary to nor unreasonable applications of clearly established federal

law. Three of the remaining claims: (1) sufficiency of the evidence, (2) improper omission of an adverse-inference jury charge, and (3) reversal of the later guilty plea, are procedurally barred either because they were unexhausted and cannot be raised again in any state court forum or because they were rejected by the state court on independent and adequate state procedural grounds. These latter claims, in any event, also lack merit. I turn first to the exhausted claims.

## Discussion

### A. Exhausted Claims

#### 1. Ineffective Assistance of Counsel

##### a. Trial Counsel

Samuels principally argues that his trial counsel was ineffective for (1) failing to conduct an adequate pretrial investigation by interviewing Coules and Dinally, as this would have revealed that Santiago did not have a bruise on her neck; (2) failing to consult with a medical expert before trial or present expert testimony at trial in order to rebut the testimony of Dr. Moritz; (3) failing to call Coules and Dinally as witnesses to undermine the testimony of Dr. Moritz; and (4) failing to resubmit Samuels's request for an adverse-inference charge.[6] Mem. of Law 1-8.

---

[6] Samuels also claims that the State effectively provided him with incompetent counsel because the pay scale for court-appointed counsel under section 722 of the New York County Law was so low. Mem. of Law 9-13. The trial court, ruling on Samuels's Section 440.10 Motion, denied this claim, stating: "Contrary to the defendant's claims, however, the record reveals that he had the assistance of a very able and competent attorney, Calvin Simons. Mr[.] Simons, an experienced criminal defense attorney, has represented numerous defendants before this court and, in spite of the inadequate compensation he received, was always an excellent advocate." R. Ex. O, at 2. A review of the record demonstrates that the trial court did not unreasonably decide this claim.

Under 28 U.S.C. § 2254, federal courts may not grant a writ of habeas corpus on a claim that was adjudicated on the merits in a state court unless the state court's decision was "contrary to . . . clearly established Federal law," § 2254(d)(1), "involved an unreasonable application of" that law, id., or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). As used in subparagraph (d)(1), "clearly established Federal law" refers to the holdings of the Supreme Court's decisions "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000) (O'Connor, J.).

The clearly established federal law governing questions of ineffective assistance of counsel is provided by Strickland v. Washington, 466 U.S. 668 (1984). Since Samuels's submissions indicate that he relies on the "unreasonable application" exception to § 2254(d), he is not entitled to habeas relief unless the state court unreasonably applied the Strickland standard.

In order to prove ineffective assistance of counsel, Strickland requires a petitioner to demonstrate: (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." 466 U.S. at 687. Turning first to the performance aspect of the Strickland test, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. Courts must be "highly deferential" to counsel's performance such that "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Regarding investigation, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. A reasonable strategic decision may often lead counsel

-11-

not to call every witness who can give mitigating or exculpatory evidence, as that witness may also give damaging testimony. See Burger v. Kemp, 483 U.S. 776, 789 n.7, 791-92 (1987). "To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." Harrington v. Richter, 562 U. S. ____, 131 S. Ct. 770, 790 (2011). To establish prejudice under Strickland, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Because both the Strickland and 2254(d) standards are highly deferential, "when the two apply in tandem, review is doubly so." Richter, 131 S. Ct. at 788.

Samuels first claims that if counsel had conducted an adequate investigation he would have discovered the information Coules and Dinally later gave to his investigator, which Samuels claims contradicts Dr. Moritz's testimony that Santiago refused methadone and that she had a bruise on her neck. However, counsel's conduct was not unreasonable. Coules and Dinally based their statements in the affidavit on the medical records, which counsel already had at trial. Coules and Dinally added nothing new. Additionally, nothing in Coules's and Dinally's affidavits contradicted Dr. Moritz's testimony. Coules stated that she had found abrasions to the anterior portion of Santiago's neck and that Santiago stated that she was a heroin abuser and would like detoxification. Both facts were contained in the medical records. That neither Coules nor Dinally noted a bruise on Santiago's neck does not connote its absence. Santiago could have had both a bruise and an abrasion. Indeed, Dr. Moritz testified that it could take hours for a bruise to appear. In a related claim, Samuels faults counsel for not calling Coules or Dinally at trial. For

-12-

the same reasons, counsel's performance was not deficient. Additionally, counsel could have made a strategic decision not to call them because they would have corroborated Santiago's testimony that she had a mark on her neck.

Samuels next contends that counsel was ineffective for not consulting with a medical expert to rebut Dr. Moritz's testimony or calling one at trial. Samuels maintains that a medical expert would have established that: (1) Santiago did not have a bruise on her neck, (2) the mark on Santiago's neck was an abrasion that most likely resulted from scratching related to Santiago's withdrawal symptoms, (3) the absence of injury to Santiago's vagina suggested that she had engaged in consensual sex, and (4) that Santiago did not refuse medication. Mem. of Law 6.

Samuels fails to demonstrate that counsel acted unreasonably. First, Samuels does not indicate that an expert was or is available to testify as to any of these facts. All of Samuels's assertions, except that concerning vaginal injury, are not the type for which an expert is specially qualified to establish. Next, Samuels's assertion that Santiago's abrasion was due to scratching during withdrawal has no support in the record and would not have led counsel to seek an expert on that point. Finally, it was reasonable for counsel to rely on cross-examination and summation argument to rebut Dr. Moritz's testimony, which he did ably. For example, counsel elicited from Dr. Moritz that the EMT noted no marks on Santiago's neck and argued in summation that Santiago manufactured the rape allegation to gain admittance into a detoxification program and in revenge for not being paid. Trial Tr. 519-20, 523-24. Counsel also questioned Dr. Moritz at length about his testimony that rape victims often do not sustain vaginal injuries even when intercourse is forced. Id. at 315-19.

Samuels also faults counsel for failing to resubmit a request for an adverse-inference

charge regarding the prosecution's loss of a handwritten aided police report relating to Santiago. The prosecution informed the court before trial that it had lost the report, but that it had disclosed to Samuels a typewritten aided report. Id. at 47. Defense counsel asked for an adverse-inference charge. Id. at 48. The court asked the prosecution if there had been any physical injury in the case, and the prosecutor replied that, based on his reading of the hospital records, physical injury was not at issue. Id. at 48-49. Finding no prejudice, the court denied defense counsel's request but deferred ruling until trial testimony was developed. Id. at 49. As noted earlier, Dr. Moritz later testified that Santiago had a bruise on her neck.

Samuels argues that the absence of the handwritten aided report denied him important impeachment evidence in that it would have shown that the first responders found no visible injury. But, as the Appellate Division found in an alternative holding, Samuels, 303 A.D.2d at 770, 757 N.Y.S.2d at 105, because defense counsel developed that fact from other sources Samuels was not prejudiced and, thus, not entitled to an adverse-inference charge under state law. See People v. Herrera, 285 A.D.2d 613, 728 N.Y.S.2d 745 (2d Dept. 2001). Counsel does not provide deficient performance by failing to make a frivolous request. Accordingly, the state court's decision denying Samuels's claims of ineffective assistance of trial counsel was not unreasonable.

### b. Appellate Counsel

Although Samuels did not explicitly claim ineffective assistance of appellate counsel in his petition or accompanying memorandum of law, he suggests in his reply brief that, by incorporating the Coram Nobis Motion by reference, he seeks review here of the claims he brought in that motion. Because "the submissions of a pro se litigant must be construed liberally

-14-

and interpreted 'to raise the strongest arguments that they <u>suggest</u>,'" <u>Triestman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis in <u>Triestman</u>) (quoting <u>Pabon v. Wright</u>, 459 F.3d 241, 248 (2d Cir. 2006)), I review the claims that Samuels brought in the Coram Nobis Motion and conclude that the state court's decision was neither unreasonable nor contrary to federal law.

In the Coram Nobis Motion, Samuels faulted appellate counsel for failing to (1) investigate and expand the record on appeal, (2) argue that the adverse-inference charge issue was preserved for appellate review, (3) argue that the hospital records were improperly admitted into evidence, (4) ask to reargue the direct appeal, and (5) allege ineffective assistance of trial counsel.

Turning first to appellate counsel's failure to raise certain claims on appeal, appellate counsel is not required to argue all non-frivolous issues on appeal. The "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986) (quoting <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983)). "[A] petitioner may establish constitutionally inadequate performance [of appellate counsel] if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker. . . . 'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994) (quoting <u>Gray v. Greer</u>, 800 F.2d 644, 646 (7th Cir. 1985)).

None of the claims Samuels now says appellate counsel unreasonably omitted were

clearly stronger than those she presented. First, for the reasons set forth above in the discussion on Samuels's allegations of ineffective assistance of trial counsel, that claim had no merit and was not a "significant and obvious" issue. Second, appellate counsel was justified in not challenging the introduction of Santiago's hospital records. Contrary to Samuels's contention, the records were not prepared in anticipation of litigation. Rather, they were prepared in the regular course of hospital business and thus admissible. See People v. Ortega, 15 N.Y.3d 610, 617, 942 N.E.2d 210, 214, 917 N.Y.S.2d 1, 5 (2010) ("[B]usiness records are deemed trustworthy both because they reflect routine business operations and because the person making the particular entry has the responsibility to keep accurate records that can be relied upon for business purposes."); People v. Baltimore, 301 A.D.2d 610, 610-11, 754 N.Y.S.2d 650, 651 (2d Dep't 2003) ("The statement in the hospital records that the complainant was 'kicked, slapped, pulled by her hair and had a knife to her neck,' was properly admitted pursuant to the business records exception to the hearsay rule because it was relevant to the diagnosis and treatment of the complainant's injuries." (internal citation omitted)). The introduction of the medical records into evidence also did not violate the Confrontation Clause, and, in any event, for the reasons stated below in Part (3), Crawford did not apply to Samuels's case.

Regarding Samuels's claim that appellate counsel should have argued that the adverse-inference charge issue was preserved for appeal, counsel pointed out in her brief to the Appellate Division that trial counsel had asked, before trial, for such an instruction. R. Ex. D, at 12. She then argued at length that the omission of an adverse-inference instruction was reversible error. Id. at 24-27. As noted above, the Appellate Division found that the claim was not preserved because the request was not renewed during the jury charge conference. Nevertheless, the court

reviewed the issue and, in an alternative holding, concluded that Samuels was not prejudiced by the non-disclosure of the handwritten aided report because trial counsel elicited testimony that other portions of the medical records reflected no neck injuries.

Finally, Samuels does not demonstrate that the Appellate Division unreasonably denied his claims that counsel should have conducted an investigation and asked to reargue the appeal. An investigation would have been frivolous since appellate counsel was confined to presenting matters based on the record. See N.Y. Crim. Proc. Law § 470.15; People v. Worrell, 488 N.Y.S.2d 200, 201 (2d Dep't 1985). Samuels offers no reason appellate counsel should have moved to reargue the appeal. Nonetheless, counsel's decision to concentrate on asking the Court of Appeals to consider the one claim that was not procedurally barred or contingent on procedurally barred claims was justified. Samuels does not demonstrate that the Appellate Division's denial of the Coram Nobis Motion was unreasonable or contrary to Supreme Court precedent in any respect.

### 2. Prosecutorial Misconduct

As he did before the state courts, Samuels argues that the prosecutor's summation rendered his trial unfair. This claim was denied on the merits by the state court and was exhausted. The standard for evaluating instances of improper prosecutorial argument is whether the statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks omitted) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Even though a prosecutor's comments may be deserving of condemnation, the court evaluating the comments must focus on the fairness of the trial. See id. at 181 n.13. Moreover, "a court should not lightly

-17-

infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." Donnelly, 416 U.S. at 647. In Darden, the Supreme Court relied on a number of non-exclusive factors reviewing courts may use. These factors are whether the comment misstated the evidence, whether the judge admonished the jury to disregard the comment, whether the comment was invited by defense counsel in its summation, whether defense counsel had an adequate opportunity to rebut the comment, the prominence of the comment in the context of the entire trial, and the weight of the evidence. See Darden, 477 U.S. at 182.

Although the prosecutor, in his summation, addressed the Soto, Jones, and Santiago cases in turn, some of his comments were generally applicable to all the cases.[7] First, speaking about the absence of door lock knobs in Samuels's car, the prosecutor stated: "I submit to you there's

---

[7] Some of the prosecutor's statements that Samuels says were improper did not pertain to Santiago's rape at all. Those statements called into question (1) Samuels's explanation of why he had blood on the pants he wore during the alleged sexual assault of Jones, Trial Tr. 561, (2) his denial that he told police that a prostitute was masturbating in the back of his car, again only applicable to Jones, id. at 565, and (3) his testimony that he had never seen Soto "on the streets," id. at 550. These statements did not apply in any way to the Santiago rape. Moreover, the trial court was careful to note that the evidence of each crime was limited to that crime, instructing the jury:

> Now, in this case we have several different crimes involving three different people that have been joined together and the only reason they have be[en] joined together is for the convenience of the Court. When you consider the evidence in this case you are required to separate in your minds the evidence as to each one of these three cases and return a separate verdict based solely on the evidence for each of these crimes.

Id. at 574.

-18-

only one reason there were no knobs back on that door [sic] and that's because he wanted control. Because the only way you could get out of that car is if he decided you could get out." Trial Tr. 560-61. The prosecutor initially implied some agency on Samuels's part in the lack of knobs on the back doors, stating that "the locks in the back were disabled." Id. at 560. However, the court sustained an objection and corrected the prosecutor, telling the jury: "Testimony was they didn't open in the back, not that they were disable[d]." Id.

Samuels argues that the prosecutor misstated the evidence because there was no testimony on that point. The State proffers that Samuels "assumes that the prosecutor used the word 'knob' to mean 'handle.'" Resp. Br. 48. There was no evidence at trial that the door handles were missing. However, there was testimony at trial that there were no "knobs" in the back of the car, and, in context, it is apparent that both the witness who established that point and the prosecutor intended "knobs" to mean door lock knobs. See Trial Tr. 136. In any event, the prosecutor's statement was a fair comment on the evidence, and, by stating, "I submit," the prosecutor signaled to the jury that the statement was argument. To the extent the prosecutor implied that Samuels disabled the locks, the trial court immediately sustained an objection and corrected any misapprehension.

Next, the prosecutor asked: "[C]ould you imagine a prostitute, prostitute in Brooklyn, somebody who has been on the street for a while, Tonya Jones said she was, had been for six years, could you imagine her doing anything unless she has the money in her hand?" Id. at 566-67. This statement was not improper. First, it was a fair comment on Santiago's and Soto's testimony, both of whom testified that they asked for payment in advance. Id. at 193-94, 328:14-16. Second, it was invited by defense counsel's suggestion in summation that Santiago fabricated

the rape accusation because Samuels did not pay her.  See id. at 520.

Finally, Samuels challenges the prosecutor's suggestion that he was obsessed.  See R. Ex.
D, at 30 ("The prosecutor had absolutely no basis for labeling Samuels as obsessed, as being
driven by an uncontrollable compulsion to control others.").  In three representative comments,
the prosecutor stated that Samuels was "two different people," Trial Tr. 541, "has a dark side," id.
at 542, and had a compulsion, id. at 544.  Although there was no basis in evidence to state that
Samuels was compelled to dominate women or that he had two personalities in a clinical sense,
Samuels himself testified that he had a twenty-year history of frequenting prostitutes and
Santiago testified that Samuels suddenly turned violent during the encounter despite appearing
friendly at first.  Id. at 222-23, 227-28, 429.

It was not unreasonable for the state court, applying Darden, to find that none of the
comments Samuels complains of rendered his trial unfair.  First, in addition to the reasons
already set forth, on several occasions throughout the prosecutor's statements, the trial court
reminded the jury that summation was argument.  E.g., id. at 543, 558.  Second, to the extent that
any of the comments were improper, the weight of the evidence heavily favored the prosecution.
Santiago's testimony was bolstered by the police officer who first responded to her 911 call and
testified about her general condition and apparent distress and by her medical records that
Samuels does not dispute showed marks on her neck.  Moreover, it is worth noting that despite
the alleged misconduct of the prosecution, the jury acquitted Samuels of the rapes of Soto and
Jones.

### 3. Newly Discovered Evidence and Crawford

Samuels's remaining claims that are not procedurally barred — that newly discovered

evidence negates the forcible compulsion element of his rape conviction and that Dr. Moritz's testimony and the introduction of the medical records violated <u>Crawford</u> — are meritless. First, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." <u>Herrera v. Collins</u>, 506 U.S. 390, 400 (1993). Furthermore, as demonstrated above, Coules's and Dinally's affidavits were not new evidence and do not cast doubt on Samuels's conviction. Finally, <u>Crawford</u> cannot be applied to Samuels's claim. In <u>Whorton v. Bockting</u>, the Supreme Court held that <u>Crawford</u> announced a new rule that could not be applied retroactively on habeas review of a conviction that became final before <u>Crawford</u> was decided. <u>Bockting</u>, 549 U.S. 406, 417, 421 (2007). <u>Crawford</u> was decided on March 8, 2004, 541 U.S. 36, about five months after Samuels's conviction became final. <u>See</u> <u>Mungo v. Duncan</u>, 393 F.3d 327, 333 n.3 (2d Cir. 2004).

## B. Barred Claims

The remainder of Samuels's claims are procedurally barred. The sufficiency of the evidence, the adverse-inference charge claim, and the guilty plea claim, although raised in the Appellate Division are not exhausted because they were not pursued in the Court of Appeals.

### 1. The Exhaustion Requirement

With certain exceptions not applicable here, § 2254 requires that habeas petitioners exhaust available state court remedies before the writ can be granted. 28 U.S.C. § 2254(b)(1)(A). "In doing so, a petitioner must present his federal constitutional claims to the highest court of the state before a federal court may consider the merits of the petition." <u>Grey v. Hoke</u>, 933 F.2d 117, 119 (2d Cir. 1991). "In New York, to invoke one complete round of the State's established

appellate review process, a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." Galdamez v. Keane, 394 F.3d 68, 74 (2d Cir. 2005) (internal quotation marks and citation omitted).

In this case, Samuels, through counsel, filed two letters with the Court of Appeals. The first, to which Samuels attached the Appellate Division briefs, stated, in pertinent part: "This will request permission to appeal to the Court of Appeals from an order of the Appellate Division, Second Department . . . affirming convictions rendered . . . in the Supreme Court, Kings County." R. Ex. F, at 1. Three weeks later, once counsel learned which judge would be reviewing the application, she wrote the judge a letter focused on one point of error: "This appeal presents a single question of law — whether the prosecutor's summation so overstepped the bounds of appropriate advocacy as to require reversal in this close case." R. Ex. G, at 1. The three pages of counsel's letter discussed only the prosecutorial misconduct issue and concluded: "Appellant is not aware of any recent cases in which the Court of Appeals has reminded prosecutors about the bounds of proper advocacy in summation. This would be a good case in which to do so." Id. at 3.

The Second Circuit has provided guidance as to what claims are fairly presented in a letter application to the New York Court of Appeals when a defendant attaches his Appellate Division briefs to that application. In Grey, the petitioner had raised three issues to the Appellate Division but mentioned only one in his leave application, to which he had attached his Appellate Division brief. 933 F.2d at 119. The Second Circuit rejected the petitioner's contention that by attaching the brief he had fairly apprised the Court of Appeals of the two claims he did not

-22-

mention in his letter application, finding that "[t]he fair import of petitioner's submission to the Court of Appeals . . . was that [those] two [claims] had been abandoned." Id. at 120.

In Morgan v. Bennett, the petitioner's first letter to the Court of Appeals — to which he had attached his Appellate Division briefs — expressly requested review of all the arguments contained in those briefs, and a second letter dwelled on two specific issues contained in the briefs. 204 F.3d 360, 369 (2d Cir. 2000).[8] The Second Circuit held that the second letter did not limit the scope of the first letter but merely supplemented the original request to review all the arguments. Id. at 369-71 (distinguishing Grey).

In Jordan v. Lefevre, the petitioner, in his single letter to the Court of Appeals, "forcefully argued" one claim for three paragraphs and in the fourth paragraph requested leave to appeal "for all of these reasons and the reasons set forth in his Appellate Division briefs." 206 F.3d 196, 198 (2d Cir. 2000) (internal quotation marks and alteration omitted). The Second Circuit, distinguishing Morgan, held that this formulation did not adequately present to the Court of Appeals the arguments contained in the briefs. Id. at 198-99. The Jordan court, quoting the first letter in Morgan, went on to state: "Had appellant more clearly stated that he was pressing all of the claims raised in the attached brief, or had his letter made no argument in detail but rather only 'request[ed that the Court of Appeals] consider and review all issues outlined in defendant-appellant's brief,' the result here would be different and the remaining claims would

---

[8] The petitioner's first letter to the Court of Appeals asked the court to "review all issues outlined in defendant-appellant's brief and pro se supplemental brief." Morgan, 204 F.3d at 369-70 (original emphasis omitted). The second letter, sent in response to the clerk of court's advice to present any supplemental arguments directly to the judge reviewing his application, began, "[T]he question presented by this case," id. at 370 (internal quotation marks and alteration omitted), and continued to present what that question was, id. After discussing that issue, the petitioner stated that he "would also like to draw [the judge's] attention" to another issue. Id.

have been fairly presented to the Court of Appeals." <u>Id.</u> at 199 (alteration in <u>Jordan</u>) (quoting <u>Morgan</u>, 204 F.3d at 370-71).

In <u>Galdamez</u>, the petitioner filed two letters with the Court of Appeals; the first stated: "Enclosed please find copy [sic] of the decision of the Appellate Division affirming this conviction. The appellant hereby requests leave to appeal to this Court." 394 F.3d at 70. The second stated: "Enclosed please find briefs submitted to the Appellate Division together with the decision affirming the conviction." <u>Id.</u> The Second Circuit held that "the Court of Appeals would construe the concise application in this case as a request for review of all of the issues outlined in the briefs." <u>Id.</u> at 76. The court distinguished <u>Grey</u> by indicating that the petitioner's letter in that case "had affirmatively directed the Court of Appeal's attention <u>away</u> from claims contained in the attached briefs." <u>Id.</u> (emphasis in original).

Finally, in <u>Bumpus v. Warden Clinton Correctional Facility ("Bumpus v. Warden")</u>, 311 F. App'x 400 (2d Cir. 2009), the petitioner filed one letter through counsel to the clerk of court requesting leave to appeal and a second pro se letter briefly highlighting a single issue. The first letter resembled the first letter in <u>Galdamez</u> in all material respects, stating, in part: "Enclosed please find a copy of Order of Appellate Division affirming the conviction of the appellant together with the briefs filed by the appellant and respondent. The appellant respectfully requests leave to appeal to this Court." <u>Bumpus v. Superintendent of Clinton Correctional Facility ("Bumpus v. Superintendent")</u>, 507 F. Supp. 2d 246, 260 (E.D.N.Y. 2007), <u>vacated in part affirmed in part</u>, <u>Bumpus v. Warden</u>, 311 F. App'x 400; <u>see</u> <u>Galdamez</u>, 394 F.3d at 70. The second letter, filed pro se, began:

> I am submitting this letter application for a certificate granting
> leave to appeal to the Court of Appeals from the order of the

> Appellate Division, Second Judicial Department, which affirmed
> my conviction of murder in the second degree. Among the issues
> raised on appeal to that court, was the issue of whether there was a
> violation of the Sixth Amendment of the United States
> Constitution and it's [sic] counterpart of Article I § 6 of the New
> York State Constitution where the court at nisi prius granted the
> prosecutor's request for closure of the courtroom without just
> cause, and without a proper showing of necessity.

Bumpus v. Superintendent, 507 F. Supp. 2d at 260. The Second Circuit, following Morgan, held

that the second letter did not "narrow the scope of the claims 'fairly presented' by the first letter,"

and that all the arguments contained in the Appellate Division briefs were properly before the

Court of Appeals. Bumpus v. Warden, 311 F. App'x at 401 (quoting Morgan, 204 F.3d at 371).

The Second Circuit reasoned that its "conclusion is particularly warranted in this case where the

attorney who filed the first letter did not withdraw from the case and the second letter was a pro

se submission by the defendant." Id. at 402. Bumpus v. Warden, which does not have

precedential effect, see 2d Cir. R. 32.1.1 ("Rulings by summary order do not have precedential

effect."), agreed with the district court that Galdamez compelled the conclusion that the first

letter, on its own, preserved for review all the issues presented to the Appellate Division. See

Bumpus v. Warden, 311 F. App'x at 401-02.

Applying the cited case law to the facts here, I conclude that Samuels's second letter was

sufficiently forceful and dedicated to a single issue that the Court of Appeals could not fairly

have construed the two letters together as a request that all the arguments contained in the

Appellate Division briefs be considered. Bumpus v. Warden is distinguishable in that the second

letter in that case was a pro se submission, a factor which the court clearly considered, and the

petitioner explicitly stated that the issue he highlighted in that submission was "[a]mong the

issues" presented to the Appellate Division. Morgan is also distinguishable. Although the

-25-

follow-up letter in <u>Morgan</u> began "[T]he question presented by this case . . .," implying that no more than one issue was presented by the case, the petitioner undercut that inference by drawing the court's attention to a second issue after discussing the first.

Here, by contrast, Samuels gave every indication in the second letter that he intended to argue only the prosecutorial misconduct issue. Samuels, through counsel, introduced the issue by explicitly stating that the appeal presented "a <u>single</u> question of law." R. Ex. G, at 1 (emphasis added). Unlike the petitioner in <u>Morgan</u>, he then focused for three pages on specific instances of improper argument. And he concluded by suggesting that his would be an opportune case in which to "remind[] prosecutors about the bounds of proper advocacy in summation." <u>Id.</u> at 3. The Court of Appeals could only reasonably assume that Samuels forfeited the other arguments contained in the Appellate Division briefs. <u>Accord</u> <u>Jackson v. Lee</u>, No. 10 Civ. 3062, 2010 WL 4628013, at *20 & nn.28-29 (S.D.N.Y. Nov. 16, 2010) (collecting cases). Accordingly, except for his prosecutorial misconduct argument, all the issues presented in Samuels's Appellate Division briefs are unexhausted.

### 2. Claims Are Deemed Exhausted if Procedurally Barred in State Court

New York allows only one request for direct review by the Court of Appeals. <u>See</u> <u>Harden v. LaClaire</u>, No. 07-4592, 2008 WL 783538, at *14 n.12 (S.D.N.Y. Mar. 26, 2008) (noting that a restriction limiting a criminal defendant to only one leave to appeal "may be inferred" under N.Y. Ct. App. R. § 500.20). And a petitioner may not seek collateral review of a claim which should have been brought on direct appeal but, without justification, was not. N.Y. Crim. Proc. Law § 440.10(2)(c). "For exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim

procedurally barred.'" Grey, 933 F.2d at 120 (quoting Harris v. Reed, 489 U.S. 255, 263 n. 9 (1989)). If a federal claim is unexhausted but procedurally barred from being raised in state court, it is procedurally barred from federal habeas review. See Acosta v. Artuz, 575 F.3d 177, 188 (2d Cir. 2009).

Here, Samuels exhausted only the prosecutorial misconduct issue on direct appeal, and he may not collaterally attack the remaining unexhausted issues. The remaining claims he presented on direct appeal (i.e., adverse-inference, guilty plea and sufficiency of the evidence) are thus barred from habeas review.[9]

### 3. The Cause and Prejudice or Miscarriage of Justice Exceptions

In order to overcome the procedural bar, a petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). A petitioner may demonstrate cause by showing that the procedural default was the result of ineffective assistance of counsel. E.g., Bossett v. Walker, 41

---

[9] A separate procedural bar also prevents the adverse-inference charge claim and the sufficiency of the evidence from being reviewed here: the independent and adequate state grounds doctrine. As a general rule, a federal claim raised in a § 2254 motion is barred if the state court has decided that claim by relying on a state law ground "that is independent of the federal question and adequate to support the judgment," Lee v. Kemna, 534 U.S. 362, 375 (2002), regardless of whether the state court ruled on the merits of the claim in an alternative holding, Harris, 489 U.S. at 264 n.10. Relying on New York's contemporaneous-objection rule, see N.Y. Crim. Proc. Law § 470.05(2), the Appellate Division found these claims unpreserved for appellate review. The application of that rule to the sufficiency claim was adequate because Samuels made only a general motion to dismiss, and to the adverse-inference charge claim because counsel did not resubmit a request for that charge once testimony was heard.

Samuels also raises a claim of false evidence that the State contends is barred because the trial court denied it on independent and adequate state grounds. However, it suffices to say that Samuels's claim of false evidence is clearly meritless.

F.3d 825, 829 (2d Cir. 1994). But a claim of ineffective assistance of counsel cannot defeat the procedural default if it itself was not raised before the state court as to the instance of the default. Reyes v. Keane, 118 F.3d 136, 140 (2d Cir. 1997) ("We think the Supreme Court's rationale [in Murray v. Carrier, 477 U.S. 478 (1986)], grounded in the principle of comity, equally compels the conclusion that a claim of cause for procedural default is not itself excepted from the doctrine of procedural default."); Bossett, 41 F.3d at 829. Additionally, "attorney error that does not rise to the level of ineffective assistance is not cause for a petitioner's procedural default." Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991); see Carrier, 477 U.S. at 488 ("So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in Strickland v. Washington, we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default." (internal citation omitted)).

Samuels asserts in his reply brief that his failure to raise the guilty plea claim to the Court of Appeals was the result of appellate counsel's ineffectiveness. This claim is obviously not exhausted since he failed to raise it in the Coram Nobis Motion. In any event, it fails on the merits. Even if the guilty plea claim should have been attached to the prosecutorial misconduct argument, he has failed to meet the prejudice prong of Strickland. The claim was dependent on the reversal of Samuels's conviction at trial. See People v. Fuggazzatto, 62 N.Y.2d 862, 863, 466 N.E.2d 159, 160, 477 N.Y.S.2d 619, 620 (1984). As set forth herein, Samuels had no viable grounds to reverse his conviction.

Because Samuels fails to demonstrate cause, prejudice need not be addressed. Nevertheless, for the reasons stated below in discussing the miscarriage of justice exception and the merits of Samuels's unexhausted claims, Samuels would not be able to establish prejudice

had he attempted to. Cf. Schlup v. Delo, 513 U.S. 298, 327 (1995) ("The petitioner thus is required to make a stronger showing [to demonstrate a miscarriage of justice] than that needed to establish prejudice.").

The "miscarriage of justice" exception applies only in cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Carrier, 477 U.S. at 496. In order to establish actual innocence, a petitioner must first bring forward "new reliable evidence," House v. Bell, 547 U.S. 518, 537 (2006) (internal quotation marks omitted) (quoting Schlup, 513 U.S. at 324), and then demonstrate that, in light of all the evidence, both old and new, "it is more likely than not that no reasonable juror would have convicted him," id. at 536-38 (internal quotation marks omitted) (quoting Schlup, 513 U.S. at 327 (1995)).

The newly discovered evidence Samuels claims would have exonerated him is contained in the two affidavits Samuels's post-conviction investigator obtained. As discussed in more detail above in the discussion on ineffective assistance of counsel, none of the statements contained in the affidavits would have led to a different result.

Samuels argues that the new evidence would have supported his defense at trial, which was that he had consensual sex with Santiago, that there was no "forcible compulsion" and that Santiago fabricated the rape allegation in order to gain admission into a detoxification program and in retaliation for Samuels's nonpayment. At trial, Dr. Moritz testified that the mark on Santiago's neck was a bruise, which was consistent with her having been choked. He also testified that the hospital records indicated that Santiago had refused methadone the day after she was admitted into detoxification. As noted, Samuels points to the affidavits of Coules and Dinally to rebut these assertions, particularly Coules's statements that Santiago had abrasions to

her neck and requested detoxification and Dinally's statement that Santiago was a heroin user.

These statements are not the potent rebuttal evidence Samuels makes them out to be. Initially, at trial, Santiago characterized the mark on her neck as a scratch, not a bruise. Coules's statement in her affidavit that she found abrasions on Santiago's neck corroborates that testimony. Dinally's affidavit added no new information. Furthermore, Santiago testified that she had previously been admitted to detoxification without alleging any facts other than that she was an addict. And Samuels points to no evidence that contradicts Dr. Moritz's testimony that Santiago refused methadone, which is not inconsistent with Santiago's general request to undergo detoxification. To the extent that the affidavits are new evidence, Samuels falls far short of demonstrating that "it is more likely than not that no reasonable juror would have convicted him."

## C. Merits of the Barred Claims (Sufficiency of the Evidence; Adverse-Inference Charge; Reversal of Guilty Plea)

Even were Samuels's unexhausted claims reviewable here, they would not succeed on the merits. Because the Appellate Division denied these claims on the merits, its decision would have been accorded AEDPA deference. First, Samuels falls far short of showing that the Appellate Division acted unreasonably or contrary to Supreme Court precedent in rejecting his claim that the evidence at trial was legally insufficient to support his conviction. In order to demonstrate legal insufficiency, Samuels had to show that no "rational trier of fact could have found the essential elements of the crime [with which he was charged] beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Santiago's testimony alone would have been sufficient to establish that she was forcibly compelled to have sex with Samuels. See People v. Flippen, 126 A.D.2d 665, 666, 511 N.Y.S.2d 93, 94 (2d Dep't 1987); cf. Schlup, 513

-30-

U.S. at 330 ("[T]he assessment of the credibility of witnesses is generally beyond the scope of review [under Jackson].").  But, as noted, Santiago's testimony was not the only evidence that tended to show that Samuels raped her.  It was bolstered by the testimony of the officer who first responded to her 911 call as well as by the medical records.

The claim also fails in light of what Samuels terms newly discovered evidence.  Even when viewed charitably, the affidavits do not contradict Dr. Moritz's testimony.  As the State points out, the fact that Santiago had an abrasion on her neck does not diminish the possibility that she also had a bruise.  And contrary to Samuels's assertion, the presence of bruising on Santiago's neck was not necessary to prove the forcible compulsion element of rape under New York law.  See N.Y. Penal Law § 130.00(8) ("'Forcible compulsion' means to compel by either: a. use of physical force; or b. a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person, or in fear that he, she or another person will immediately be kidnapped.");  People v. Gonzalez, 136 A.D.2d 735 (1988) (holding that the prosecution's evidence proved forcible compulsion beyond a reasonable doubt where the defendant threatened the victim but the victim was not physically injured).

Samuels's contention that the trial court erred in not issuing an adverse-inference charge fails as well.  As a threshold matter, the claim does not rise to the level of a federal constitutional violation.  See Estelle v. McGuire, 502 U.S. 62, 68 (1991).  Moreover, the claim fails for the reasons set forth above in the Court's discussion of ineffective assistance of counsel.  Similarly, Samuels was not entitled to have his guilty plea overturned because reversal was contingent on the success of his other claims.  See Fuggazzatto, 62 N.Y.2d at 863, 466 N.E.2d at 160, 477 N.Y.S.2d at 620.

**Conclusion**

For the reasons stated, Samuels's petition for a writ of habeas corpus is denied. A certificate of appealability shall not issue because Samuels has not made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2); Lucidore v. New York State Div. of Parole, 209 F.3d 107, 112-13 (2d Cir. 2000). The Court certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from a judgment denying the instant petition would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962). The Clerk of the Court is directed to enter judgment and to close the case.

Dated: Brooklyn, New York
June 27 2011

SO ORDERED:

/S/

Carol Bagley Amon
United States District Judge